IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| TANTOPIA FRANCHISING COMPANY, LLC | : | CIVIL ACTION |
| | : | |
| v. | | |
| | : | |
| WEST COAST TANS OF PA, LLC, DONALD WEISS, RICHARD WEISS, CHRISTOPHER CONNORS, TMA INTERNATIONAL, LLC, CTG GROUP LLC, and ROSALIND WEISS | : : | NO. 12-6700 |

**MEMORANDUM OF DECISION**

THOMAS J. RUETER                                    January 22, 2013
United States Magistrate Judge

        Presently before the court is plaintiff's Motion for Preliminary Injunction (the "Motion") (Doc. No. 2).  Defendants filed a Response in opposition thereto (the "Response") (Doc. No. 22).  On January 10, 2013, the parties filed proposed findings of fact ("FF") and conclusions of law ("Concl. Law") (Doc. Nos. 26 (Plaintiff's), 27 (Defendants')).  A hearing was held on the Motion on January 11 and 14, 2013 (the "Hearing").  Pursuant to Rules 52 and 65 of the Federal Rules of Civil Procedure, the court makes the following Findings of Fact and Conclusions of Law:

I.      **FINDINGS OF FACT**

        A.      **The Philadelphia Salon**

        1.      Plaintiff operates a retail indoor tanning salon franchise system and has registered its mark "Tantopia" with the United States Patent and Trademark Office (the "Tantopia Mark").  (Pl.'s FF No. 7.)

2.       On October 24, 2002, plaintiff entered into a Franchise Agreement ("Franchise Agreement") with defendant West Coast Tans of PA, LLC ("West Coast Tans") for the operation of a Tantopia salon located at 2118 Cottman Avenue, Philadelphia, Pennsylvania (the "Philadelphia Salon").  (Pl.'s FF No. 8.)  The term of the Franchise Agreement was for ten years.  West Coast Tans was owned by Donald Weiss and his son, Richard Weiss.

3.       Paragraph 17.3 of the Franchise Agreement contained a non-compete provision (the "Non-Compete Covenant") which stated as follows:

17.3    Franchisee covenants that, except as otherwise approved in writing by Franchisor, Franchisee shall not, for a continuous uninterrupted period of two (2) years commencing upon the date of: (a) a transfer permitted under Section 14 of this Agreement; (b) expiration of this Agreement; (c) termination of this Agreement (regardless of the cause for termination); (d) a final order of a court of competent jurisdiction (after all appeals have been taken) with respect to any of the foregoing or with respect to enforcement of this Section 17.3; or (e) any or all of the foregoing; either directly or indirectly, for itself, or through, on behalf of, or in conjunction with any person or legal entity, own, maintain, operate, engage in, be employed by, provide assistance to, or have any interest in (as owner or otherwise) any business that: (i) offers or sells products or services which are the same as or similar to the products and services offered by the Tantopia Tanning Centers Salon under the System, including, without limitation, tanning services, and related skin care and accessory products; and (b) [sic] is, or is intended to be, located at or within:

17.3.1  the Protected Territory; or

17.3.2  the county or municipality in which the Approved Location is located; or

17.3.3  five (5) miles of the Approved Location; or

17.3.4  ten (10) miles of any business operating under the Proprietary Marks;

provided, however, that Sections [sic] 17.2.3 and this Section 17.3 shall not apply to the operation by Franchisee of any business under the System which may be franchised by Franchisor to Franchisee under a written Franchise Agreement.

2

4.     The parties agree that under the terms of the Franchise Agreement, the Non-Compete Covenant would expire on or about October 23, 2014.  (Pl.'s FF No. 33.)

5.     Pursuant to a Guarantee (the "Guarantee"), defendants Donald and Richard Weiss guaranteed the obligations of West Coast Tans to plaintiff.  See Franchise Agreement Ex. C.  In the Guarantee, defendants Donald and Richard Weiss agreed as follows: "The undersigned hereby acknowledge and agree to be individually bound by all of the confidentiality provisions and non-competition covenants contained in Sections 10 and 17 of the [Franchise] Agreement."

6.     Donald and Richard Weiss also executed a Confidentiality and Non-Competition Agreement.  See Franchise Agreement Ex. B.  The Confidentiality and Non-Competition Agreement contains a non-compete covenant almost identical to the Non-Compete Covenant in the Franchise Agreement.  At the Hearing, the parties focused their attention and argument on the Non-Compete Covenant in the Franchise Agreement.  The court will do so in this Memorandum of Decision.

7.     West Coast Tans operated the Philadelphia Salon until January 31, 2010, when it filed a form with the Pennsylvania Department of Revenue to go out of business.  (Ex. D-36.)  The Philadelphia Salon was operated by West Coast Tans inside a leasehold space of an entity known as Valley Video Entertainment, LLC ("Valley Video").  Valley Video was the lessee under the lease for the Philadelphia Salon.  As a result of defaults under the lease, the lease for the space was terminated on December 1, 2009, and Valley Video and West Coast Tans ceased all operations at the Philadelphia Salon and abandoned all personalty located therein.

8.      West Coast Tans did not inform plaintiff that it went out of existence or that the Philadelphia Salon ceased operations.

9.      On December 1, 2009, CTG Group, LLC ("CTG") entered into a lease for a portion of the space at the Philadelphia Salon that had been surrendered by Valley Video and began to operate a tanning business under the name Tantopia, as well as a massage and anti-aging business under the unregistered names iMassage and iSpa.  CTG was created on November 9, 2009.  (Ex. P-12.)  The assets of West Coast Tans were transferred to CTG in or about January 2010.

10.     West Coast Tans did not inform plaintiff that CTG was the successor entity to West Coast Tans or that CTG was operating a Tantopia business at the Philadelphia Salon.

11.     As noted supra ¶ 2, West Coast Tans was owned by Donald and Richard Weiss.  CTG was owned ninety percent (90%) by Rosalind Weiss (wife of Donald Weiss) and ten percent (10%) by Richard Weiss.

12.     CTG operated the Philadelphia Salon until October 26, 2012.

13.     The Franchise Agreement expired on October 23, 2012.

14.     By letter dated November 13, 2012 addressed to Donald and Richard Weiss and West Coast Tans, plaintiff exercised its option under section 16.8 of the Franchise Agreement to purchase the equipment used at the Philadelphia Salon.  (Ex. P-2.)  At the Hearing, counsel for defendants acknowledged that plaintiff exercised this option in a timely manner as required by the Franchise Agreement.  Defendants did not fulfill their obligations under the Franchise Agreement when plaintiff exercised of this option.

15.     In late summer/early fall of 2012, Donald Weiss realized that he would not be able to continue to operate the business at the Philadelphia Salon due to issues with the landlord.  He attempted to find another location for the business.  Donald Weiss found a potential business location on Welsh Road, in Northeast Philadelphia, PA, but was unable to obtain a lease for this location.  See Gardner Dep. at 21-22 ("all I know he [Donald Weiss] was going to open up a store on Welsh Road and somehow or another that fell through").

16.     On August 24, 2012, a Sheriff's Determination in Favor of Property Claim was filed in the Court of Common Pleas of Philadelphia County.  (Ex. P-14.)  The personal property at the Philadelphia Salon (including the video business), valued at $17,195, was determined to be owned by CTG.  According to Exhibit P-14, the value of the tanning equipment at the Philadelphia Salon was $9,255 as of June, 2012.

**B.     The Southampton Salon**

17.     On November 5, 2012, TMA International LLC ("TMA") was created. (Ex. P-17.)  The evidence does not reveal who created TMA.[1]

18.     On September 10, 2012, pursuant to a Bill of Sale, the tanning equipment, computer equipment, massage equipment, store fixtures and tanning and massage lotion

---

[1]     Defendants contend that defendant Christopher Connors is TMA's sole shareholder.  Connors is a twenty-two year old male and is the son of defendant Richard Weiss' former fiancée who died in 2006.  Connors lived with his mother and Richard for approximately one year at Donald and Rosalind Weiss's house; lived with his mother and Richard for approximately two and one-half years between the ages of thirteen and fifteen, and then upon his mother's death, lived with Richard Weiss until he graduated high school.  See Pl.'s FF No. 18; Defs.' FF Nos. 31-32 (Connors lived with the Weisses in various combinations from August 2001 until May, 2010).  Connors' only paying job was working as an hourly employee for CTG at the Philadelphia Salon.  Connors' 1040 EZ tax return for 2011 lists wages, salaries and tips in an aggregate amount of $6,178.  (Ex. P-20.)

inventory were sold by CTG to TMA for $3,000.  (Ex. P-6.)[2]  TMA has never paid the $3,000

purchase price.  In lieu of paying the purchase price, Connors allowed CTG to use the equipment

listed in the Bill of Sale for one month at the Philadelphia Salon.

          19.     Donald Weiss contacted Bernard Kanefsky ("Kanefsky"), the agent for the

landlord at Redwood Village Shopping Center, Southampton, PA, inquiring about rental space

located at 261 Second Street Pike (the "Southampton Salon").  (Kanefsky Dep. at 9-10.)[3]

Kanefsky testified at his deposition about a meeting he had with Donald and Richard Weiss

regarding the Southampton location.  Id. at 17-18.  Having never met with the landlord nor seen

the space, Connors, on behalf of TMA, entered into a lease for the Southampton Salon.  The

lease is to commence on February 1, 2013.  (Ex. P-16.)

          20.     In order for TMA to obtain funds to open the Southampton Salon, Donald

Weiss contacted Jules Gardner, an old friend.  (Gardner Dep. at 12.)  Mr. Gardner testified that

Donald Weiss is a friend and he dated Donald's daughter a few times.  Id. at 7, 9.  From the

1990's through 2005, Mr. Gardner lent/gave Donald between $20,000 and $30,000.  Id. at 8-10.

Sometime after 2005, Mr. Gardner gave Donald a car.  Id. at 11.  Mr. Gardner testified that he

---

[2]     The court notes that the Seller on the Bill of Sale is identified as "CTG Group
LLC, 2118 Cottman Avenue Philadelphia, PA 19149," and the Buyer is identified as "CTG
Group LLC, 261 Second Street Pike, Redwood Village Shopping Center, Southampton, PA
18966."  See Ex. P-6.  On page two of the Bill of Sale, the buyer is identified as "CTG Group
LLC," and the Seller is identified as "TMA International LLC."  Despite this inconsistency, the
parties agree that this Bill of Sale represents the sale of the identified equipment from CTG to
TMA.

[3]     Kanefsky & Associates is the agent for The New Redwood Partnership, the
landlord for the Southampton Salon.

lent Donald Weiss funds because he understood that Donald had problems with the landlords and that Donald's "business wasn't doing so well."  Id. at 10-12.

        21.    In fall 2012, Donald Weiss asked Mr. Gardner for a $60,000 loan.  Id. at 12.  Mr. Gardner's accountant prepared a promissory note identifying Donald Weiss as the borrower (the "Note").  (Ex. P-5.)  The Note is dated September 19, 2012.  Id.  Mr. Gardner delivered the Note to Donald Weiss at a bank.  (Gardner Dep. at 14.)  Donald Weiss directed Mr. Gardner to cross out Donald's name on the Note and replace it with TMA International, LLC.  Id. at 14-15.  Donald Weiss directed Mr. Gardner to make the check payable to TMA.  Id. at 18-19.  TMA was not officially formed until November 5, 2012.  (Ex. P-17.)  But see Defs.' FF No. 35 (TMA formed October 15, 2012).  Connors executed the Note on October 18, 2012.  The first time Mr. Gardner saw the Note with Connor's signature and various handwritten "cross outs" on the bottom of the Note was at his deposition on January 4, 2013.  Id. at 18.  Mr. Gardner did not meet Connors, nor did he negotiate the loan with Connors.  The first payment under the Note is due September 2013.  (Ex. P-5.)

        22.    The Southampton Salon is located 3/10 of a mile from a Tantopia business operated by Tantopia Tanning Centers Inc. at 511 Second Street Pike, Southampton, PA ("Tantopia Tanning Center Southampton Salon") and within five miles of a Tantopia business being operated at 771 Huntingdon Pike, Rockledge, PA (the "Rockledge Salon").

        23.    The Southampton Salon will offer tanning services identical to those provided by these two salons, plus massage and anti-aging services and products.  Counsel for defendants stated that approximately fifty percent (50%) of Southampton Salon's business will be tanning services.

24.     At the time of her deposition on January 4, 2012, Shawna Brady worked as the manager of the Tantopia Tanning Center Southampton Salon.  (Brady Dep. at 7-8.)  On November 12, 2012, Ms. Brady walked to the Southampton Salon and saw a Tantopia sign and uninstalled Tantopia tanning booth doors at the location.  Id. at 15, 19.

25.     On November 12, 2012, Ms. Brady spoke to Donald Weiss at the Southampton Salon and asked about applying for a job.  Id. at 29. Donald Weiss identified himself as the owner of the Southampton Salon, told Ms. Brady about the prices and showed her around the location.  Id. at 29-30, 33.  Richard Weiss and Connors also were present at the Southampton Salon.  Id. at 29.  Richard Weiss was on the computer and his cell phone; Connors handed Ms. Brady an employment application.  Id. at 33-34.

26.     As of the date hereof, TMA has not begun operating a tanning business at the Southampton Salon.  (Defs.' FF No. 51.)

**C.    Tantopia Trademark**

27.     Plaintiff has one registered trademark for the word "Tantopia."

28.     Plaintiff does not own or maintain any registered trademark for any logo, color pattern or trade dress.

29.     TMA has never used, and confirmed at the Hearing that it will not use, the Tantopia Mark in the operation of its business.

30.     Plaintiff has never offered massage or anti-aging services.  Plaintiff offers tanning services and related tanning products.

**D.    Bankruptcy Filings**

31.     In January 2010, the assets of West Coast Tans were transferred to CTG.

32.     In February 2010, Donald Weiss filed for bankruptcy protection and he received a discharge on April 7, 2011.

33.     At the Hearing, counsel for defendant Donald Weiss acknowledged that Donald did not list his obligations to plaintiff under the Franchise Agreement or the Guarantee, or any other obligations to plaintiff, on his bankruptcy schedules, and did not notify plaintiff of his bankruptcy filing.

34.     After the instant action was filed in this court, Richard Weiss filed for bankruptcy protection on December 12, 2012.  The automatic stay imposed by the bankruptcy filing stays action by this court against defendant Richard Weiss in the instant matter.

**E.     Amended Complaint**

35.     In an Amended Complaint (Doc. No. 25) filed January 8, 2013, plaintiff asserts eight claims against various of the defendants:

| | |
|---|---|
| Count I: | Trademark Infringement against all defendants subject to stay of proceedings against Richard Weiss |
| Count II: | Violation of Covenant Not to Compete against all defendants except Rosalind Weiss, subject to stay of proceedings against Richard Weiss |
| Count III: | Specific Performance against West Coast Tans, Richard Weiss (subject to stay of proceedings), Donald Weiss, Christopher Connors and TMA |
| Count IV: | Accounting against West Coast Tans, CTG, Donald Weiss and Richard Weiss (subject to stay of proceedings) |
| Count V: | Breach of Franchise Agreement against West Coast Tans, Donald Weiss and Richard Weiss (subject to stay of proceedings) |
| Count VI: | Unjust Enrichment against West Coast Tans, CTG, Donald Weiss and Richard Weiss (subject to stay of proceedings) |

Count VII:      Conspiracy against all defendants except Richard Weiss

Count VIII:     Tortious Interference with Contract against all defendants except
                West Coast Tans and Richard Weiss

**F.      Violation of the Non-Compete Covenant**

36.     As set forth in detail in the court's Finding of Fact No. 3, section 17.3 of the Franchise Agreement contains the Non-Compete Covenant to which Donald and Richard Weiss are bound.

37.     There is no dispute that, for the purposes of the Non-Compete Covenant, the Tantopia Tanning Center Southampton Salon and the Rockledge Salon are businesses operating under plaintiff's proprietary trademark, and the Southampton Salon is within ten miles of these two business.

38.     This court finds that at the Hearing defendant Connors did not testify credibly with respect to the creation and operations of the Southampton Salon.

39.     This court finds that at the Hearing defendants Donald Weiss and Richard Weiss did not testify credibly with respect to the creation and operations of the Southampton Salon.

40.     It is undisputed that if Donald Weiss or Richard Weiss were operating the Southampton Salon, they would be in violation of the Non-Compete Covenant.  Donald Weiss previously had been employed in the sale of franchises.  He knew that he and his son could not operate Southampton Salon in their names or in the name of any related company.

41.     Donald Weiss, Richard Weiss, West Coast Tans and CTG have embarked on a scheme to mask their participation in the Southampton Salon.

10

42.     Connors would have been unable to enter into the contracts required to open and run the Southampton Salon without assistance, financial, business advice or otherwise, from Donald Weiss and Richard Weiss.  Donald Weiss secured the Southampton location for the Southampton Salon and the $60,000 loan/ gift from Mr. Gardner, and identified himself as the owner of the business.  CTG, owned by Richard Weiss and Rosalind Weiss, sold the assets of the Philadelphia Salon, valued on June 15, 2012 at $9,255, see Ex. P-14, to TMA for $3,000.  TMA never paid the purchase price to CTG for the assets and Richard Weiss testified that he does not expect Connors to pay CTG any money for these assets.  Donald Weiss has been seen at the Southampton Salon on numerous occasions setting up the business and speaking with an architect.  Richard Weiss has been seen at the Southampton Salon on numerous occasions setting up the business and working the cash register, see Ex. P-27 (cash register receipt from Southampton Salon identifying "Rich Weiss" as the "Main Drawer").  These actions by Donald and Richard Weiss violate the Non-Compete Covenant.

43.     Connors is acting as a figurehead or straw man for Donald and Richard Weiss to mask their ownership or control of the Southampton Salon.

## II.   CONCLUSIONS OF LAW

Plaintiff moved for a preliminary injunction seeking to enjoin defendants from, inter alia:  (1) operating, marketing, promoting, or selling indoor tanning salon services and products through and with the Tantopia Mark at the Southampton Salon or the Philadelphia Salon; (2) violating the Non-Compete Covenant; and (3) using any of the furnishings, equipment, supplies or inventory formerly used at the Philadelphia Salon.  See Doc. No. 2.  The standard for evaluating a motion for a preliminary injunction involves a four-part inquiry:  (1) whether the

11

movant has shown a reasonable probability of success on the merits; (2) whether the movant will

be irreparably injured by denial of relief; (3) whether granting preliminary relief will result in

even greater harm to the nonmoving party; and (4) whether granting the relief will be in the

public interest.  See United States v. Bell, 414 F.3d 474, 478 n.4 (3d Cir. 2005); Pappan Enter.,

Inc. v. Hardee's Food Sys., Inc., 143 F.3d 800, 803 (3d Cir. 1998).  The movant bears the burden

of establishing every element in its favor.  P.C. Yonkers, Inc. v. Celebrations the Party &

Seasonal Superstore, LLC, 428 F.3d 504, 508 (3d Cir. 2005).  The court need not grant the total

relief sought by plaintiff, but may mold its decree to meet the exigencies of the particular case.

11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure §

2947 at 123 (2d ed. 1995) ("Wright & Miller").

### A.      Reasonable Probability of Success on the Merits

The court finds that plaintiff has demonstrated a reasonable probability of success

on the merits of its claim of violation of the Non-Compete Covenant in the Franchise Agreement.

See Am. Complaint Count II.[4]  Under Pennsylvania law, a non-compete covenant is enforceable

if: (1) the covenant relates to either a contract for the sale of good will or other subject property;

(2) the covenant is supported by adequate consideration; and (3) the application of the covenant

is reasonably limited in both time and territory.  Piercing Pagoda, Inc. v. Hoffner, 351 A.2d 207,

210 (Pa. 1976).  Under Pennsylvania law, non-compete covenants are to be strictly construed

since they are "a partial restraint upon the free exercise of trade."  Hayes v. Altman, 266 A.2d

---

[4]      Because a reasonable probability of success on the merits of the claim of violation
of the Non-Compete Covenant in the Franchise Agreement is sufficient to support entry of the
proposed  preliminary injunction, the court will not address the merits of plaintiff's other claims.

12

269, 271 (Pa. 1970); Maaco Franchising, Inc. v. Augustin, 2010 WL 1644278, at *3 (E.D. Pa.

Apr. 20, 2010).[5]

Defendants do not contest the first two factors above.[6]  Defendants also do not

urge that the Non-Compete Covenant at issue herein is unreasonable in time or territory.[7]  Rather,

defendants asserted at the Hearing and in their proposed conclusions of law that the "restrictive

covenant is overbroad to the extent that it seeks to enjoin any party from providing assistance to

TMA in the organization of its business."  (Defs.' Concl. Law No. 36.)

As noted above, the parties do not dispute that if Donald Weiss and Richard

Weiss were operating the Southampton Salon, they would be in violation of the Non-Compete

---

[5]        The Pennsylvania Supreme Court has concluded that "our Courts will permit the equitable enforcement of a covenant not to compete included in a franchise agreement where the restrictions are reasonably necessary for the protection of the franchisor without imposing undue hardship on the franchisee and the restrictions are reasonably limited as to duration of time and geographical extent."  Piercing Pagoda, 351 A.2d at 212.  See also Sparks Tune-Up, Inc. v. White, 1989 WL 41321, at *1 (E.D. Pa. Apr. 18, 1989) ("Under a franchise agreement where for example, the franchisor provides business expertise, business training, use of corporate names and logo, advertising assistance and exclusivity rights in a certain geographical area, the franchisor's interest may be properly protected by a reasonable covenant not to compete for a period following termination of the contract.") (citing Piercing Pagoda, 351 A.2d at 210).

[6]        In any event, it is well-settled that a non-compete covenant in a franchise agreement relates to the sale of goodwill and is supported by adequate consideration on both sides.  See Athlete's Foot Mktg. Assocs. v. Zell Inv., Inc., 2000 WL 426186, at *9 (W.D. Pa. Feb. 17, 2000) (citing Piercing Pagoda, 351 A.2d at 210).

[7]        Two year non-compete covenants have been deemed reasonable.  See Rita's Water Ice Franchise Co., LLC v. S.A. Smith Enter., LLC, 2011 WL 101694, at *7 (E.D. Pa. Jan. 11, 2011) (two year non-compete covenant reasonable); Novus Franchising, Inc. v. Taylor, 795 F.Supp. 122, 128 (M.D. Pa. 1992) (two year restrictive covenant reasonable); Piercing Pagoda, 351 A.2d at 212 (three year restrictive covenant reasonable).  The ten mile geographic scope of the Non-Compete Covenant also is reasonable.  See Piercing Pagoda, 351 A.2d at 212 (thirty mile radius reasonable); Maaco Enterprises, Inc. v. Brenmer, 1998 WL 669936, at *4 (E.D. Pa. Sept. 29, 1998) (ten mile radius reasonable); Am. Mut. Liab. Ins. Co. v. Kosan, 635 F.Supp. 341, 344-45 (W.D. Pa. 1986) (fifty mile radius approved), aff'd, 817 F.2d 751 (3d Cir. 1987).

13

Covenant.  This court finds that Donald Weiss and Richard Weiss are operating the Southampton

Salon through TMA and Connors.  As summarized above, Connors would have been unable to

enter into the contracts required to open and run the Southampton Salon without assistance from

Donald Weiss and Richard Weiss.  Donald Weiss secured the location for the Southampton

Salon, the $60,000 loan from Mr. Gardner and has identified himself as the owner of the

business.  CTG, owned by Richard Weiss and Rosalind Weiss, sold the assets of the Philadelphia

Salon, valued on June 15, 2012 at $9,255 to TMA for $3,000.  See Ex. P-14.  TMA never paid

the purchase price to CTG for the assets, and Richard Weiss testified that he does not expect

Connors or TMA to pay any money for these assets.  Donald Weiss has been seen at the

Southampton Salon on numerous occasions setting up the business and speaking with an

architect.  Richard Weiss has been seen at the Southampton Salon on numerous occasions setting

up the business and working the cash register, see Ex. P-27 (cash register receipt from

Southampton Salon identifying "Rich Weiss" as the "Main Drawer").  This court concludes that

plaintiff has demonstrated a reasonable probability of success on the merits of its violation of the

Non-Compete Covenant claim against Donald and Richard Weiss, West Coast Tans and CTG.

Defendants assert that Donald Weiss and Richard Weiss should be permitted to

provide advice to Connors.  However, the Non-Compete Covenant provides otherwise.  The

Non-Compete Covenant specifically provides that Donald Weiss and Richard Weiss may not

> either directly or indirectly, for itself, or through, on behalf of, or in conjunction
> with any person or legal entity, own, maintain, operate, engage in, be employed
> by, provide assistance to, or have any interest in (as owner or otherwise) any
> business that: (i) offers or sells products or services which are the same as or
> similar to the products and services offered by the Tantopia Tanning Centers
> Salon under the System, including, without limitation, tanning services, and
> related skin care and accessory products, . . .

14

Franchise Agreement section 17.3.4 (emphasis added).  Courts considering this issue have held that the purpose of restrictive covenants is to protect against the use of capital in a competing business as well as the skill and expertise of the individual in question.

In Stone v. Stone, 1916 WL 4702 (Pa. Super. Ct. 1916), the defendant sold his interest in a bottling business to his partner and was subject to a non-compete covenant prohibiting him from "enter[ing] into any such business in said city."  Id. at *1.  During the term of the covenant, the defendant became a manager of his brother's competing bottling business, arguing that since his brother was the owner of the business, the defendant was not in violation of the covenant.  The court noted that there was "testimony sufficient to warrant the inference that [the defendant] was the real owner of the business," but proceeded on the assumption that the defendant was merely the manager.  Id.  The court concluded that the defendant was in violation of the covenant and stated as follows:

> Although he may not have been the owner of the rival concern, he was nevertheless in the true sense of the term, engaged in the bottling business.  The evident purpose of the agreement was to prevent the defendant using, to the detriment of plaintiff's business, the experience he had acquired in his connection with the business extending over a period of many years, with his knowledge of the trade and his acquaintance with the customers.  With all these advantages he could deprive the plaintiff to a great extent of the benefits which he was to derive from the agreement.

Id.

In view of the manifest language and purpose of the Non-Compete Covenant, the covenant requires not only that Donald Weiss and Richard Weiss refrain from employing their capital in a competing business, but also should refrain from employing their skill and experience in any capacity in a business similar to plaintiff's business.

In addition to defendants West Coast Tans, CTG, Donald Weiss and Richard Weiss, plaintiff's claim for violation of the Non-Compete Covenant also is pled against TMA and Connors.  It is well-established that a non-covenantor who benefits from the covenantor's relationship with a competing business must abide by the same restrictive covenant agreed to by the covenantor.  See Total Car Franchising Corp. v. L&S Paint Works, Inc., 981 F.Supp. 1079, 1082 (N.D. Tenn. 1997) (not only covenantor and new company bound but also his "servants or agents and those acting in collusion or combination with him") (citations omitted); McCart v. H&R Block, Inc., 470 N.E.2d 756, 762 (Ind. Ct. App. 1984) (husband of former H&R Block franchisee bound to her restrictive covenant noting that the husband and wife's cooperative conduct amounted to a subterfuge to avoid "[the wife's] obligation under the contract"); Suburban Oil Serv., Inc. v. Parker, 63 Pa. D. & C.2d 91, 93, 1973 WL 15264 (Pa. Com. Pl. May 1, 1973) ("[W]here a husband is enjoined from establishing a second business after covenanting not to compete, a wife should not be allowed to obtain the benefit of the proceeds of said covenant and then, defiantly, in her name, establish a like business.  This recalls the old adage 'you can't have your cake and eat it too.'").[8]

Case law and the language of the Non-Compete Covenant prohibit Donald Weiss and Richard Weiss, West Coast Tans and CTG from providing any assistance to TMA at the Southampton Salon.  The actions of Donald and Richard Weiss detailed above amount to nothing

---

[8]    The factual scenarios in this line of cases involve a familial relationship between the covenantor and the owner of the competing business.  In the instant case, Connors is not related by blood to either Donald or Richard Weiss.  The facts are clear, however, that Connors is close to the Weisses, lived with his mother and Richard Weiss for years, and then continued to live with Richard Weiss after Connor's mother died.  It is clear that a long standing strong bond exists between Connors and the Weisses.  See also Ex. P-25.

more than mere subterfuge to avoid their obligations under the Non-Compete Covenant.

Moreover, the court finds that the evidence weighs in favor of finding that TMA and Connors are

a mere continuation of, or  straw man for, Donald and Richard Weiss, West Coast Tans and

CTG.  For these reasons, this court finds that plaintiff has demonstrated a reasonable probability

of success on the merits of its claim for violation of the Non-Compete Covenant in Count II of

the Amended Complaint.

      **B.**      **Irreparable Harm**

      The second factor a court must consider before granting preliminary injunctive

relief is the extent to which plaintiff will suffer irreparable injury if injunctive relief is denied.

"To obtain injunctive relief, the plaintiff must make a clear showing of 'immediate irreparable

injury' or a 'presently existing actual threat.'"  Chicago Title Ins. Co. v. Lexington & Concord

Search and Abstract, LLC, 513 F.Supp.2d 304, 319 (E.D. Pa. 2007) (quoting Acierno v. New

Castle Cnty., 40 F.3d 645, 655 (3d Cir. 1944)).  An applicant for injunctive relief must

demonstrate that "absent the issuance of the preliminary injunction, the plaintiff will suffer harm

that cannot be sufficiently redressed following a trial on the matter."  Id. (citing Acierno, 40 F.3d

at 653).  Irreparable harm is injury that cannot adequately be compensated by monetary damages.

"Grounds for irreparable injury include loss of control of reputation, loss of trade, and loss of

goodwill."  Pappan, 143 F.3d at 805.

      In the instant case, plaintiff has demonstrated that it will suffer irreparable harm if

the preliminary injunction is denied.  Plaintiff has an interest in the goodwill its franchise has

created.  The court in Jiffy Lube Int'l, Inc. v. Weiss Bros., Inc., 834 F.Supp. 683 (D.N.J. 1993),

applying New Jersey law, emphasized "that the primary characteristic of a franchise is the license

given to the franchisee to trade upon and exploit the franchisor's goodwill." Id. at 691.  The

court further explained that in a franchise, the goodwill inherent in the name and mark attaches to

the entire business of the franchisee, not just to the goods themselves.  Id. (citation omitted).  The

Supreme Court of Pennsylvania also held that restrictive covenants in franchise agreements are

enforceable to protect "the basic product which the franchisor has to sell, namely the franchise

itself, . . ."  Piercing Pagoda, 351 A.2d at 211.  The goodwill in plaintiff's franchise allows

plaintiff to maintain a recognizable and respected name in the marketplace, provide uniform

services to its customers, and increase the marketability of the Tantopia name to potential

franchisees.  It has been noted that "[i]njury to reputation or goodwill is not easily measurable in

monetary terms, and so often is viewed as irreparable."  11A Wright & Miller, § 2948.1 at 159

(footnote omitted).

Plaintiff also has as an interest in being able to place a new franchise in the area

where the goodwill has been created.[9]  The presence of a competing tanning salon within the

---

[9]     Defendants argue that the two Tantopia locations within the ten mile territory, the
Tantopia Tanning Center Southampton Salon and the Rockledge Salon, are not franchisees
subject to the protection offered by the Non-Compete Covenant.  Rather, these two locations are
owned by the three individuals who own plaintiff, and therefore own the trademark, and a silent
partner.  The court finds that this distinction is irrelevant.  First, these locations operate
businesses using the Tantopia Mark and therefore are entitled to the protections offered by the
Non-Compete Covenant.  Additionally, the owners of these locations could decide to sell to an
additional franchisee within this territory, to close these locations and sell a new franchise, or to
transfer their use of the Tantopia Mark at these locations to a third party.  The fact that the
Tantopia Tanning Center Southampton Salon and the Rockledge Salon are using plaintiff's
trademark in a form other than as a franchisee is irrelevant.  Indeed, it is not uncommon for a
franchise system to establish two corporations, one to operate as the proprietor of its own stores
and the other as a franchisor that licenses franchisees.  See, e.g, Principe v. McDonald's Corp.,
631 F.2d 303, 305 (4th Cir. 1980), cert. denied, 451 U.S. 970 (1981).

geographic area protected by the Non-Compete Covenant reduces the value of the Tantopia Mark to a potential new franchisee who might consider opening a Tantopia business within the area.

Plaintiff also has suffered irreparable harm to the extent that the Southampton Salon intends to offer tanning services that will directly compete with the services offered by the Tantopia Tanning Center Southampton Salon and the Rockledge Salon.  Ms. Brady testified at her deposition that customers at the Tantopia Tanning Center Southampton Salon had asked her about the Southampton Salon, and that one customer mentioned that her mother had purchased three months of tanning at the Southampton Salon.  (Brady Dep. at 8-9.)  Defendants are correct that the Southampton Salon has yet to provide tanning services and, therefore, the exact number of customers the other salon will lose, if any, is unknown.  This is not fatal to plaintiff's claim of irreparable harm.  Irreparable harm for the purposes of a preliminary injunction can be established by showing a likelihood of such harm.  A leading commentator has explained as follows:

> There must be a likelihood that irreparable harm will occur.  Speculative injury is not sufficient; there must be more than an unfounded fear on the part of the applicant.  Thus, a preliminary injunction will not be issued simply to prevent the possibility of some remote future injury.  A presently existing actual threat must be shown.  However, the injury need not have been inflicted when the application is made or be certain to occur; a strong threat of irreparable injury before trial is an adequate basis.

11A Wright & Miller, § 2948.1 at 153-56 (footnotes omitted).  Pennsylvania courts have held that interference with customer relationships satisfies the irreparable harm requirement.  See Coventry First, LLC v. Ingrassia, 2005 WL 1625042, at *11 (E.D. Pa. July 11, 2005) (applicant demonstrated threat to its customer relationships) (citation omitted).  See also Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co., 22 F.3d 546, 552 (4th Cir. 1994)

("[W]hen the failure to grant preliminary relief creates the possibility of permanent loss of customers to a competitor or the loss of goodwill, the irreparable injury prong is satisfied.") (citations omitted).

Lastly, plaintiff has demonstrated that it will suffer irreparable harm in that permitting former franchisees to violate terms of a franchise agreement, including the Non-Compete Covenant, will set poor precedent for other franchisees.  At the time of the Hearing, plaintiff had three franchisees whose franchise agreements are set to expire in the near future.  If plaintiff fails to enforce the Non-Compete Covenant in the instant Franchise Agreement, other franchisees will be encouraged to violate such covenants.  See Jiffy Lube Int'l, 834 F.Supp. at 693 ("[P]laintiff may suffer irreparable harm if it is prevented from enforcing the provisions of a Franchise Agreement similar to one signed by all of its franchisees. . . . Were plaintiffs not allowed to terminate an errant franchisee . . . other franchisees would get the message that they could defraud with impunity."); Athlete's Foot Mktg. Assocs., Inc. v. Zell Inv., Inc., 2000 WL 426186, at *7 (W.D. Pa. Feb. 17, 2000) ("Other . . . franchisees whose franchise agreements are coming up for renewal in the future may be watching to see if [the defendant] is permitted to breach its non-compete covenant, which would establish a potentially catastrophic precedent and a 'domino' effect whereby a series of franchisees leave the fold to establish competing business at or near the location of their [franchise] store(s).").

The court finds that plaintiff has more than adequately demonstrated that it will suffer irreparable harm absent the imposition of the preliminary injunction.

C.      **Harm to Defendants**

The third factor a district court must consider before granting preliminary injunctive relief is the harm defendants might suffer should the relief be granted.  In considering this factor, the court must undertake to balance the hardships to the respective parties.  Pappan, 143 F.3d at 805.  The injunction the court will order herein will preclude defendants Donald Weiss, West Coast Tans, CTG, TMA and Connors from performing tanning services and selling related skin care and accessory products from the Southampton Salon.  As of the date of the Hearing, the Southampton Salon had not yet opened, but agreed not to provide any tanning services pending resolution of this Motion.  Defendants argue that they will suffer lost revenue if prevented from performing tanning services.  However, any harm suffered by defendants with respect to this injunction was created or caused by their decision to open the Southampton Salon within the protected territory of the Non-Compete Covenant.  Moreover, any hardship will be mitigated because the court will require plaintiff to post a security bond.

In addition to tanning services, Connors also intends to provide massage and anti-aging services and products.  Donald Weiss, West Coast Tans, CTG, TMA and Connors will not be precluded from providing these services.[10]  This will mollify any potential losses to

---

[10]      Plaintiff seeks to preclude defendants from performing massage and anti-aging services at the Southampton Salon on the theory that under section 7.18 of the Franchise Agreement, any changes made to the "System" by a franchisee and approved by the franchisor may become part of the "System" and covered by the Franchise Agreement.  Plaintiff asserts that the massage services added by the Weisses at the Cottman Salon became part of the "System" under the Franchise Agreement and subject to the Non-Compete Covenant.  Prior to the termination of the Franchise Agreement, defendants neither sought nor obtained approval from plaintiff to provide massage or anti-aging services through its franchise.  The court finds that plaintiff has failed to demonstrate that it would succeed on a claim that defendants' provision of massage and anti-aging services at the Southampton Salon would constitute a violation of the Non-Compete Covenant.  The court will deny plaintiff's request to enjoin such activity.

defendants.  As noted by the court in Rita's Water Ice Franchise Corp. v. DBI Inv. Corp., 1996

WL 165518, at *5 (E.D. Pa. Apr. 8, 1996), "enforcing the restrictive covenant [as to Rita's Water

Ice business] does not force the defendants to go out of business at their present locations;

defendants may still sell snack foods such as hot dogs, chips, and soda."  Here, defendants may

provide massage and anti-aging services as well as any other services that do not violate the Non-

Compete Covenant.

        In balancing the hardships to the parties, any injury defendants might suffer as a

result of the issuance of the preliminary injunction is significantly outweighed by the irreparable

harm plaintiff would continue to suffer as a result of defendants' violation of the Non-Compete

Covenant.

        **D.      The Public Interest**

        Lastly, a court must consider whether the issuance of a preliminary injunction

serves the public interest before granting injunctive relief.  Pappan, 143 F.3d at 807.  Courts have

held that "the public interest is served by fulfilling the contractual interests of the parties and

maintaining the viability of franchise systems."  Maaco Franchising, Inc., 2010 WL 1644278, at

*4.  See Rita's Water Ice Franchise Corp., 1996 WL 165518, at *5 ("[T]he public interest

supports contractual enforcement by preventing competition in violation of a valid restrictive

covenant.").  This court finds that the public interest weighs in favor of granting the preliminary

injunction.

        **E.      Scope of the Injunction**

        The court finds that plaintiff has demonstrated the elements required for

imposition of a preliminary injunction based on defendants' violation of the Non-Compete

Covenant set forth in Count II of the Amended Complaint. Plaintiff's Motion will be granted in part and denied in part. Plaintiff's Motion will be granted to the extent that defendants Donald Weiss, West Coast Tans, CTG, TMA and Connors will be enjoined and precluded from providing tanning services and selling related skin care and accessory products at the Southampton Salon.[11] This injunction does not prevent these defendants from providing massage and anti-aging services and products at the Southampton Salon.

Additionally, defendants acknowledged and affirmed at the Hearing that they do not intend to operate a Tantopia business, will not use the Tantopia Mark, will not display the Tantopia name or products at the Southampton Salon, will replace the doors on the tanning booths so that the Tantopia name and traditional colors are not displayed, will not use the same colors traditionally used by Tantopia in its salons, and will change the front desk's appearance and color so as not to resemble the desks traditionally used at Tantopia salons. This court has not considered herein plaintiff's trademark infringement claim set forth in Count I of the Amended Complaint. In this claim, plaintiff urges, inter alia, that defendants' use of certain colors and

---

[11]     The defendants against whom Count II of the Amended Complaint is pled are: Donald Weiss, Richard Weiss, West Coast Tans, CTG, TMA, and Connors. Richard Weiss has filed for bankruptcy relief and is currently protected by the automatic stay. The court, therefore, enters no order for injunctive relief against Richard Weiss. If Richard Weiss were not protected by the automatic stay, the order entered herein would apply equally to him. Defendant Donald Weiss filed for bankruptcy relief in 2010, and obtained a discharge in April 2011. Donald Weiss asserted at the Hearing that, although he did not list his obligations to plaintiff as debts in his bankruptcy case or inform plaintiff of the bankruptcy filing, his obligations to plaintiff under the Franchise Agreement, including his obligations under the Non-Compete Covenant, have been discharged. This issue was not briefed by the parties. This court finds that plaintiff has demonstrated a reasonable probability of success on the merits of its claim for violation of the Non-Compete Covenant against Donald Weiss, and that plaintiff has demonstrated a reasonable probability of succeeding on its claim that Donald Weiss' obligations under the Non-Compete Covenant have not been discharged.

23

design layout at the Southampton Salon violates plaintiff's trademark and trade dress rights.  See

Am. Complaint Count I.  While the court has not considered whether plaintiff has demonstrated a

likelihood of success on Count I, the court notes that defendants' agreement not to use the

Tantopia Mark or the same colors as traditionally used in Tantopia salons, has addressed the

majority of plaintiff's pretrial concerns regarding its trademark and trade dress claims.

Furthermore, the injunction entered today eliminates most, if not all, of the vitality of these

claims since defendants will not be operating a business similar to plaintiff's.

In all other respects, the Motion is denied.[12]

**F.      Security Bond Requirement**

Under Fed. R. Civ. P. 65(c), an applicant for a preliminary injunction must give

security "in such sum as the court deems proper, for the payment of such costs and damages as

may be incurred or suffered by any party who is found to have been wrongfully injured or

restrained."  "Although the amount of the bond is left to the discretion of the court, the posting

requirement is not.  Absent circumstances where there is no risk of harm to the defendant, failure

to require a successful applicant to post a bond constitutes reversible error."  Chicago Title Ins.

Co., 513 F. Supp. 2d  at 322 (citations omitted).

---

[12]      In the Motion, plaintiff also requests specific performance of its right to first refusal to purchase the equipment from the Philadelphia Salon, now located at the Southampton Salon.  Plaintiff's counsel stated at the Hearing that if defendants' operations were closed, plaintiff would have neither the desire nor the need for the equipment.  While this court has not ordered the closure of defendants' operations, it has enjoined them from providing tanning and related services.  Plaintiff has not shown irreparable harm by defendants' refusal to sell the equipment to plaintiff.  Therefore, the court denies plaintiff's request for injunctive relief in the form of specific performance as set forth in Count III of the Amended Complaint.

As noted above, the court has found that plaintiff's likelihood of success on the merits of Count II of the Amended Complaint is high at this point.  Nonetheless, there is still a financial risk to defendants from the preliminary injunction.  There was no testimony at the Hearing as to the amount of lost profits to defendants should the court enjoin the operation of all or a portion of defendants' business.  The court will not speculate on what these potential lost profits could be.  The evidence shows, however, that Donald Weiss obtained $60,000 from Mr. Gardner to start the business and defendants have used this money to pay rent and to fit-out the building.  Defendants' counsel has suggested that the revenue from its tanning operations will constitute fifty percent (50%) of its overall income.  Thus, as security, the court will require plaintiff to provide a security bond of $30,000, which represents fifty percent (50%) of the amount used to fund the expenses of starting the business.

An appropriate order follows.


BY THE COURT:


/s/ Thomas J. Rueter
THOMAS J. RUETER
United States Magistrate Judge

25